PRIMEAU v. GRANFIELD.

(Circuit Court, S. D. New York. March 15, 1910.)

1. CORPORATIONS (§ 117*)—SALE OF STOCK—RESCISSION FOR FRAUD—NECESSITY FOR RESTORATION.

Where the buyer of stocks had sold most of them, he would not be entitled to a rescission of his contract of purchase for misrepresentation of the seller, being incapable of tendering restoration of what he got.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 506; Dec. Dig. § 117.*]

2. CONTRACTS (§ 138*)—ILLEGAL CONTRACT.

Even a wrongdoer is not the prey of any spoliator who may outwit him, and while the law will enforce no part of a contract, the performance of any stipulation of which is forbidden, the parties do not become outlaws when they make such a contract, and their rights in equity as well as at law are the same as those of others in so far as they do not require the enforcement of any part of the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. § 138.*]

3. EQUITY (§ 65*)—RIGHT TO RELIEF—UNCONSCIONABLE TRANSACTIONS.

The iniquitous conduct which will bar a suitor in equity need not be directed against the defendant, but must be such that the prosecution of the suitor's rights will of itself involve the protection of wrongdoing.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 65.*

He who comes into equity must come with clean hands, see note to Knapp v. S. Jarvis Adams Co., 70 C. C. A. 543.]

4. PRINCIPAL AND AGENT (§§ 23, 69*)—EXISTENCE OF RELATION—EVIDENCE.

Evidence held to show that money sent by complainant to defendant, for purchase of mining stocks was sent to him as agent, and that he so acted, so that plaintiff was entitled to an accounting for secret profits obtained by defendant through buying the stocks himself and reselling them to complainant at an advanced price.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 41, 130–145; Dec. Dig. §§ 23, 69.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Bill by Paul A. Primeau against Horace Granfield. Decree for complainant.

Charles J. Hughes, Jr., and Mark Hyman, for Primeau.

Edmund F. Richardson, Wm. H. Davis, and Frederick Lienau, for Granfield.

HAND, District Judge. This is a final hearing on a bill in equity for an accounting. The bill is voluminous, and there have been ample amendments, but the frame of it remains simple. It alleges that the complainant, Primeau, remitted from the East from time to time moneys to the defendant, Granfield, to be invested in shares of stock in mining companies and in mining claims, all in the state of Colorado. Granfield acted in the matters, according to the bill, as agent and fiduciary of Primeau, and professed to be buying the properties from third persons and to be paying to them the sums which Primeau sent him. In fact Granfield was the owner himself of all of them and the sums which he got from Primeau were much more than what he had paid for the properties. Because of his secret profits made upon these representations and the fiduciary relations which existed between the parties, Granfield, became bound to account to Primeau. The bill adds in certain cases charges of misrepresentations as to the character and value of the properties purchased. The answer concedes that the parties had dealings in mining shares and mining claims; that Primeau bought of Granfield; that the property Granfield in fact owned; and that he made profits in his sales. It takes issue upon the existence of any fiduciary relation between the two; alleges that Primeau perfectly understood that he was buying of the owner; that he dealt at arm's length; and that all the profits were the result of a legitimate gain in bargain and sale. It likewise denies any of the misrepresentations alleged.

The transactions extended over a period of about seven years, from 1894 to 1901, and comprised 10 separate corporations or claims, in a number of which there were several transactions. In all, the transactions covered by the briefs amount to 21, not including a claim for a general balance struck between the parties in the fall of 1899. The testimony was immensely voluminous, both oral and documentary, and there was an absolute conflict of testimony between the parties. To the solution of this conflict there are accessible many contemporaneous documents, consisting in the main of correspondence between the parties, during large parts of the period in question. Primeau at the outset of their relations was quite unacquainted with mines and mining. He is a man of no education, extremely illiterate, but shrewd, at least as a salesman of stock to Eastern customers on a small scale, and apparently of unbounded energy and little or no scrupulousness in the means by which he attains his purposes. Granfield was originally a salesman of books who drifted somewhat fortuitously into the business of speculating in mines at the time when Cripple Creek began to show that extraordinary richness as a gold producing territory which has since become so well-known. He is a man of decided mental power, expresses himself with vigor and pre-

cision, and is in literacy and all intellectual attainments much Primeau's superior. Though he was unscrupulous in his business dealings, his testimony reads like that of a very capable and energetic man of affairs. I have no trouble in finding that he acquired an ascendancy over Primeau and that Primeau relied upon his judgment and information, when the purchases were made. Granfield's home is in Mt. Vernon in this state, but he early maintained regular connections in Denver and was repeatedly in Colorado for long periods of time. While Primeau also went to Colorado on several occasions the measure of his acquaintance with the district of Cripple Creek and with its speculations was not in the least comparable to Granfield's, and such personal acquaintance as he ever got was for the most part in the company of Granfield, and, I think I may fairly infer, under the supervision of Granfield. Those instances in which this was not the case, do not materially affect the fact that it was through Granfield that he got such information as he did ever get about the properties he was buying. I have been obliged to go into each of the transactions in detail to determine the relations of the parties, in view of the unsatisfactory character of the testimony of each, but there are some preliminary matters which must be determined before the details properly come up.

First, I have disregarded altogether the alleged misrepresentations of Granfield regarding the properties. This is not because I think he did not mean to defraud Primeau by false statements, because in several cases I think he did, even after all allowances are made for the natural exaggeration of expression and anticipation which the astounding discoveries thereabouts to a large extent excused. The reason for disregarding the statements is that Primeau has long since himself sold and so passed on to others most of the properties he bought. These he peddled about in the East and even in France to small investors generally, both personally and through the mediation of agents. While he retains some of the property he is, in no instance able to offer a restoration of what he got, and he cannot therefore make the tender necessary to a rescission of any of the contracts. His remedy for any fraud must be at law for damages, and I have therefore confined him to the theory of his bill; that is, that Granfield received the moneys in a fiduciary capacity and misappropriated a part of them. While the misrepresentations necessarily have an important weight incidentally in the relations of the parties, no relief can be granted by virtue of them.

Granfield's affirmative defenses are two: First, laches, which at most was no more that a delay of three years, until Primeau begat to collect testimony, and which I dismiss; and, second, Primeau's disqualification to come into a court of equity because of his own inequitable conduct. The latter has some serious aspects, and, in view of the fact that it was nowhere pleaded, and—despite Granfield's efforts to show to the contrary—no where indicated in the trial, I should be obliged to allow the case to be reopened, if I thought that a prima facie case had been made out against the bill. The grounds for this defense are three: First, Primeau's fraudulent change of

180 F.—54

several letters; second, his suppression of a great number of letters; and, third, his iniquitous dealings with his customers.

Upon the first issue, there are four letters urged upon me, each of which bears evidence of some change, and each of which was put in evidence before any allegations were put in the bill of the transactions to which they refer. This satisfies me that they were never intended to be used in the suit for the purpose of supporting a fraudulent claim, and that if they were forged it was for a different purpose. Had they been changed for this suit, Primeau would have insisted on some claims being made which they would support. By far the most plausible explanation of them is that, if Primeau changed them at all, which I think most likely, he changed them for the purpose of showing to his customers that he had paid more for the properties than in fact he had. It was, for instance, most improbable that he should have thought he could have got from Granfield $10,-000 by so simple a means as raising complainant's Exhibit 431. The same reasoning applies in regard to complainant's Exhibit 380. While this explanation is most discreditable to him, and fortifies the inferences regarding his dealings with his customers, it disposes of the contention that he was corruptly using in the cause forged documents. I do not believe this to be true, and so I need not consider whether or not I should follow Harton v. McKee (C. C.) 73 Fed. 558, if on the facts it was applicable.

In regard to the second defense, the suppression of documents, I should have thought nothing of it, but for Primeau's silly explanations. That he should not produce many of the very numerous letters which passed between them is not only not surprising, but is to be expected. Granfield also failed to produce a great many letters. In the case of Primeau especially, having no fixed place of business, being a man of extremely slovenly business habits, I am rather surprised that he can produce as many as he does. However, his attempts to explain their disappearance are childish, and I do not believe them. These attempts do not by any means indicate that he suppressed the letters, but only that he supposed he must show some excuse other than the truth. If his own letters to Granfield showed any diversity in the facts from those of Granfield's he produces, some suspicion might justly ensue, but they corroborate and serve to complete the extant letters of Granfield, and do not in any case that I can recall indicate that any of Granfield's lost letters were by their contents damaging to Primeau. The correspondence which is produced certainly bears every internal evidence of being selected indiscriminately. How that could be the case if there had been any intelligent suppression of damaging letters I cannot see. Granfield makes some effort to show that some of those which do not appear are especially significant, but he does not convince one. It is true that for a continuous period of some length all correspondence seems to have disappeared that had any consequence, but as to that period I have allowed nothing to Primeau. The utmost which Granfield can ask in any case, and even if Primeau had suppressed correspondence, is that he must suffer from the presumption of what they would have shown. I know of no

rule which directs me to turn him out of court. However, as I have said, I do not regard the charge of suppression as substantiated prima facie.

The remaining objections concern Primeau's treatment of his customers. His own counsel attempts to explain the letters which he wrote to Granfield requesting him to make representations to his customers, but his efforts are wholly unsatisfactory in my judgment. It is quite clear that Primeau repeatedly suggested to Granfield that he write decoy and delusive letters. I find no instance in which I am certain that Granfield acceded to his requests, except respondent's Exhibits 214 and 215, in which Granfield wrote one letter to be used as a decoy to a customer, misrepresenting the price at which Primeau was to buy, and another letter to Primeau stating the real price. From a number of Primeau's letters I am, however, quite satisfied that he was ready to make any representations which were necessary to procure the sale of his stocks and claims, and that he tried to induce Granfield to join him in deceiving the buyers. It seems to me idle to attempt by ingenious explanations to account innocently for the suggestions which he kept making to Granfield.

However, there is no direct evidence of any single sale of stock which was procured by misrepresentations unless it be some of the sales made to Brosseau and Roberge. These sales comprise but a small part of the money for which Primeau now asks an accounting, and there is no way that I know in which the money he procured from Brosseau and Roberge under false representations, if any, can be distinguished from the other money. Granfield's effort is rather so to discredit Primeau by proof of his dealings with his customers as to make it impossible for him to come into a court of equity. The upshot of his contention is that the money which Primeau got from his customers, however it was obtained, was fair spoil for anyone else. Of course, if Granfield and he were together engaged in a corrupt conspiracy to defraud Primeau's customers, and if, in pursuance of that conspiracy, Granfield obtained the money, Primeau could not then come into this court and ask for an accounting based alone upon the corrupt contract.

While I am not wholly satisfied that the parties entered into a contract involving the swindling of Primeau's customers as an incident to its performance, certainly that is the worst construction that the evidence admits and for the purpose of argument I will assume it to have been the fact. After Primeau got the money he turned it over to Granfield to be eventually paid to the sellers. We may assume that since the contract between them contemplated the acquisition of the money by fraud neither party could have enforced any of its stipulations. Nevertheless, when Primeau got the money, it was his, in equity as at law, and all of it remained his money after it went into Granfield's hands, because Granfield took it only as his agent. Allowing to the utmost the invalidity of all the stipulations of the contract, the fact remains that Primeau's rights to the money are quite independent of the enforcement of any part of the contract, even if he had acquired it through the past performance of the contract.

When Granfield took it as agent, there remained nothing to be done, under the contract, but his payment of it to the supposed sellers, and that was an obligation that Primeau does not seek to enforce. He relies wholly upon his ownership of it once acquired, Granfield's possession of it as agent, and his failure to pay it over in accordance with his principal's instructions. Even a wrongdoer is not the prey of any spoliator who may outwit him. It is true that the law will enforce no part of a contract the performance of any stipulation of which is forbidden, but the parties do not become outlaws when they make such a contract, and their rights in equity as well as at law are the same as those of others, in so far as they do not require the enforcement of any part of the contract. This is the result of the following cases, all of which were in equity: Sharp v. Taylor, 2 Phil. Ch. 801; Harvey v. Varney, 98 Mass. 118; Heath v. Van Cott, 9 Wis. 516; Trice v. Comstock, 121 Fed. 620, 57 C. C. A. 646, 61 L. R. A. 176; Ownes v. Ownes, 23 N. J. Eq. 60; American Association, Ltd., v. Innis, 109 Ky. 595, 60 S. W. 388; Pitzele v. Cohn, 217 Ill. 30, 75 N. E. 392.

I do not at all agree with Primeau that the iniquitous conduct which will bar a suitor in equity must be directed against the defendant. The rule in trade-mark cases is quite enough to disprove that limitation of the rule at the present time, however it may have been originally. On the other hand, I do agree with him that the conduct must be such that the prosecution of the suitor's rights will of itself involve the protection of wrongdoing. It is quite true that again in the trade-mark cases the false representations which disqualify the complainant need not be a part of the very trade-mark which the complainant wishes to protect (Manhattan Medicine Company v. Wood, 108 U. S. 218, 2 Sup. Ct. 436, 27 L. Ed. 706), but they must be used in immediate association with the trade-mark. While the cases do not explicitly so decide, I think the proper interpretation is that the association of the misrepresentation must be so close that they may be regarded as together one statement made to the public. There is at least no indication in any of the cases that if the owner of the trade-mark had used a similar misrepresentation in a way quite disconnected with the trade-mark, although it was to effect the sale of his goods, such misconduct would put his whole business at the mercy of fraudulent competitors. In short, the "transaction," which must be illegal in order to defeat him, is the entire representation of which the mark is fairly a part. Since, therefore, Primeau need not rely upon the illegal contract, but only upon rights which arose through its performance, I will not dismiss his bill.

A further general objection is that Primeau could not have supposed Granfield to be his agent, because he knew that Granfield was acting in the interest of unknown sellers who paid him an indefinite commission for his services. This objection goes to the very heart of the bill's equity, because unless the fiduciary relation existed between Primeau and Granfield, Primeau could not claim any interest in the funds which he paid to Granfield without rescinding the transaction. In other words, if Primeau when he paid over the money,

intended it at once to belong either to Granfield or to Granfield's principal, he cannot in equity reclaim it without completely unravelling the transaction. He cannot at once claim to be the buyer of the property and have any interest in the purchase price, even though Granfield had wrongfully represented to him that when it was paid, he (Granfield) would hold it in trust for another.

I think that Primeau did not suppose that he lost the right of control over the money, until Granfield paid it to the sellers, and that whatever he thought were Granfield's relations with them, he meant to retain the right to change its destination and indeed to recall it, while it was in Granfield's hands. My reasons for thinking this are that it was the custom of Primeau to change the destination of moneys after Granfield had received them, which he could not have done if the money belonged to the sellers as soon as it was sent. Again, instead of sending on the whole purchase price at once, Primeau usually sent it on in small installments, though he understood that the sellers were to be paid in one or more substantial payments. From all the correspondence I am satisfied that Primeau looked upon the money he sent on as his own, until Granfield should have paid it over to the sellers. While Granfield contests the conclusion that he was acting for outside persons at all, I do not understand that he contends that if it be once admitted that he was acting for outsiders, I should assume that the payments when made must be treated as made to him irrevocably as the agent of the sellers. When, therefore, Granfield told Primeau that he had paid out to third persons what he was in fact keeping for himself, it was of no consequence whatever that Primeau supposed Granfield was getting commissions from such persons or that he was their agent. The payments which Granfield said he made never took place, and the money always remained Primeau's just as they had before he said he had paid it over.

Before taking up the transactions in detail, it will be more convenient to consider some of the questions which recur in a number of instances. The most important of these is Granfield's contention that the letters which he wrote and which purport to show that he was offering properties of third persons, Primeau well understood to be mere decoys, designed to conceal from Primeau's customers that they were both disposing of their own holdings. He even explains Primeau's own letters to him as written in the same vein, and that Primeau used to show them to his customers before they were sent, as evidence of his own good faith. In the first place, I must premise any consideration of this explanation by saying that it must be well proved. When a man seeks to put so tortured an interpretation upon his own letters, and that too a most dishonest one, I shall, as judge of the facts, look very suspiciously on it, and expect of him that he make clear proof of it before I believe him.

It is, however, true that the parties at times clearly contemplated doing just this, and in at least one instance (respondent's Nos. 214 and 215), that they did so. Unhappily the improbability of Granfield's explanation is therefore not so great, as it should be for the sake of the good faith of each, and the letters must be considered as they arise.

One check, however, for their authenticity is absolute, and that exists whenever either Granfield or Primeau mentions the price at which Primeau is to buy. In all cases Primeau sold to his customers at greatly advanced prices. It would have been fatal to Primeau's supposed use of the letters to mention the price that he was in fact paying, and any letters which do mention the actual prices may be taken as certainly authentic. There are a great many such.

Again, when in any given transaction there is one such letter which speaks of property as belonging to a third person who will sell for a given price, the rest of the correspondence touching that transaction and describing it as a proposed purchase from third persons must be taken as authentic, even when the price is not mentioned, because once the esoteric interpretation be abandoned it must be abandoned altogether as to that particular bargain.

Still another indication of the truth of the letters is to be found in Granfield's very frank though discreditable admissions that he thought it no wrong in general to deceive his customers regarding the actual ownership of those properties which he sold them.

In some cases I have been somewhat puzzled to determine whether I should interpret phrases in the correspondence as indicating one of two possible situations. Granfield's letters at times can be read as meaning either that he had a good bargain which he could close with the seller for Primeau, or that he had already closed it for himself and needed the money to complete the purchase. There is a great difference between the two, because, in the first, Primeau was sending him money with which to buy for him, while in the second he was making a purchase of Granfield who simply needed the money to discharge his own commitments to outsiders. In solving this ambiguity I have had recourse to this reasoning: In all cases of the sort, Granfield was misstating the truth, because either he had in fact already bought and paid for the property, or he owed upon it only a small part of what he received from Primeau. Of course he must have had some motives for falsely saying that the money was to be paid to third persons, and the most reasonable motive was to conceal the fact that he was really selling to Primeau. This is corroborated by his own admissions that he thought it quite honest to deceive people about his own ownership of what he sold them, and that to Primeau especially he "did this" "in all our deals" (Respondent's Proofs, 1171). Where there is doubt about which of these two constructions a letter should bear, I have therefore felt obliged to select that which Granfield has spoken of as the usual course between them. In a few cases it is quite clear that the other should be taken.

Finally, the character in general of the correspondence is of consequence. When the parties did determine upon writing decoy letters they did not speak ambiguously as respondent's Exhibits Nos. 214 and 215 plainly show. The credulity of Primeau's customers did not require fine maneuvering or delicate finesse, and besides it was very easy to write the kind of letter which answered best. The passages showing a fiduciary relation occur in letters with all sorts of other material, and bear every internal evidence of frank communica-

tion between two men who have continuous and intimate business relations. It is in most cases very difficult to believe that they could have been intended for the deception of third persons, and, unless I have been entirely thrown off the truth, I have no trouble in dismissing Granfield's interpretation of them, as the mere fabrication of a man who is put to an explanation, and who seizes the only possible one, which can gain any color from the relations of the parties.

I shall therefore treat these letters as genuine except in such cases as I indicate a contrary opinion.

The master will take and state the account in accordance with the foregoing directions, following the procedure laid down in Smith's Chancery Practice, vol. 2, p. 127 et seq., except that in place of taking out warrants from the clerk's office, the account will be filed with the master who will prescribe suitable times for each step. After the account is once stated, the master must take up the question of tracing the trust funds into the Raaler lease, as claimed in the bill. Primeau insists that some of the moneys which Granfield wrongfully got from him he used for the development of a mining claim called the Raaler, which he held on lease from a mining corporation.

The parties wish to be further heard upon the question as to the tracing of these funds, and I shall therefore not pass upon it now. Let them fix upon any convenient date, and I will hear them at chambers.